IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **David Murray**<br>6105 Pershing, 1W<br>St. Louis, MO 63112 | ) | |
| | ) | |
| **Additional Plaintiffs**<br>Named Below | ) | |
| | ) | **AW 07 CV 2261** |
| v. | ) | Civil Action #_____ |
| | ) | |
| **Alulim Willow Property Group, LLC**<br>300 Massachusetts Avenue #108, NW<br>Washington DC 20001 | ) | |
| | ) | **CIVIL COMPLAINT** |
| **John St. Augustine McDonald**<br>300 Massachusetts Avenue #108, NW<br>Washington DC 20001 | ) | |
| | ) | |
| **Adoria Doucette**<br>1111 11th Avenue, 11th Street NW<br>Washington DC  20001 | ) | |
| | ) | |
| **James P. Cook**<br>Address Unknown | ) | |
| | ) | |
| **Does 1-50**<br>Address Unknown | ) | |

**Additional Plaintiffs:**
Larry Fox, 15318 Warm Springs Lane, Manassas, VA 20112
Ellaine Gelman, 520 Tschiffely Square Road, Gaithersburg (Montgomery County), MD 20878
Arin Greenwood, 6 Berkeley Road, East Greenwich, RI 02818
Karen James, 109 Weatherby Road, Mullica Hill, NJ 08062
Eric Menhart, 17824 Chorlee Court, Gaithersburg (Montgomery County), MD 20877
Christopher Aldo Porco, 1001 N. Vermont St. #310, Arlington, VA 22201
Daniah Tajudeen, 1629 K St, NW, Suite 230, Washington DC 20006

## COMPLAINT

Plaintiffs, through counsel, Eric J. Menhart of CyberLaw P.C. and Christopher Aldo Porco of The Law Offices of Christopher Aldo Porco, PLLC, pending admission *pro hac vice*, file this suit against Defendants and state as follows:

### A. Parties

1.     At all times relevant to this action Plaintiff Daniah Tajudeen was an individual residing in Washington, DC.

2.     At all times relevant to this action Plaintiff Larry Fox was an individual residing in the Commonwealth of Virginia.

3.     At all times relevant to this action Plaintiff Ellaine Gelman was an individual residing in the State of Maryland.

4.     At all times relevant to this action Plaintiff Arin Greenwood was an individual residing in the State of Rhode Island.

5.     At all times relevant to this action Plaintiff Karen James was an individual residing in the State of New Jersey.

6.     At all times relevant to this action Plaintiff Eric Menhart was an individual residing in the State of Maryland.

7.     At all times relevant to this action Plaintiff David Murray was an individual residing in the State of Missouri.

8.     At all times relevant to this action Plaintiff Christopher Aldo Porco was an individual residing in the Commonwealth of Virginia.

9.     On information and belief Defendant John St. Augustine McDonald is an individual residing in Washington, DC, in violation of a Maryland criminal probation arising from past conduct consistent with the conduct complained of herein.

10.     On information and belief Defendant Adoria Doucette is an individual residing in Washington, DC. Ms. Doucette has a personal relationship with Mr. McDonald and is personally involved in the fraudulent conduct complained of herein.

11.     Alulim Willow Property Group, LLC is a lawfully organized corporate entity based in Washington, DC.

12.     On information and belief Defendant James P. Cook is an individual residing in the Washington, DC metropolitan area.

13.     On information and belief Does 1-50 are individuals or corporate entities liable for the conduct complained of herein, whose identities shall be disclosed during the course of discovery.

### B. Jurisdiction and Venue

14.     Jurisdiction is proper under 28 U.S.C. §1331, which provides that "the district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States," or any other law of the United States that determines that this Court has jurisdiction over this matter.

15.     Venue is appropriate based on 28 U.S.C. §1391, which provides that an action not solely based on diversity of citizenship may bring suit in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated," or any other law of the United States that determines that this Court is the proper venue for this matter.

3

## C. Allegations

16.  Between May and July 2007, Defendants advertised job openings on a multitude of job websites, including Craigslist.org, AWPGroupCareers.com, 2Worksathome.com, Sciencejobs.com, and Academiccareers.com.

17.  The Plaintiffs responded to these job advertisements, which listed job openings at the fictitious "The Global Speculator" (hereinafter "TGS") for lawyers, writers, researchers, web developers, accountants, administrators, mathematicians and professors.

18.  Various individuals from TGS responded to Plaintiffs' inquiries, and TGS sent offers of employment to Plaintiffs via e-mail.

19.  Most administrators, team leaders, and lawyers were formally hired between June 21, 2007 and July 3, 2007 by "Gerald Edward," upon information and belief, a fraudulent moniker of Defendant McDonald, who identified himself as the Chief Operating Officer (COO) of TGS.

20.  "Hasita Kumar," on information and belief, a fictitious name, took an active part in the hiring process by setting up phone interviews, e-mailing prospective employees, and putting the administrative team on assignment. In her communications "Hasita" said that she was operating from Bangalore, India.

21.  Team leaders hired by Defendants included Plaintiffs Christopher Porco and Karen James, both of whom had the opportunity to speak with "Gerald" on the phone during their hiring process.

22.  All Plaintiffs were hired by July 3rd. All of the Plaintiffs were hired for 60 day contract positions.

23.  All hires were assigned e-mail addresses under the domain name "theglobalspeculator.com" by July 7, 2007. Each of the Plaintiffs also received a written contract

4

setting out the terms of his or her particular employment agreement, including payment amount, and payment terms.

24.     In addition to monetary compensation, Plaintiffs' employment agreements also promised various employment benefits.

25.     The employment agreements also provided that TGS would reimburse Plaintiffs for any expenses incurred on behalf of the organization. Relying on these provisions, several Plaintiffs did incur costs on behalf of their employment with TGS.

26.     The employment agreements included a United States Employer Identification Number (EIN) and included the company name of Alulim Willow Property Group, LLC.

27.     Each employment agreement also included a signature line for "James P. Cook," the "Chief Executive Officer."

28.     In addition to compensation promised in the employment agreements, "Gerald" later promised stock options and other forms of compensation via e-mail communications.

29.     As a term of employment new employees were instructed to fax their signed contracts along with the appropriate documentation to the Operations Coordinator, Margaret McBreairty. Requests for personal information were consistent with typical employer requirements and United States law, including Internal Revenue Service Form W-4 and Department of Homeland Security Form I-9.

30.     Documentation provided to the Defendants by the Plaintiffs also included scanned copies of Social Security cards, passports, driver's licenses and bank account routing numbers for direct deposit via a respected payroll service known as SurePay.

31.     All Plaintiffs provided all of the requested information to Defendants.

32.     TGS and "Gerald Edward" promised that payment would be made within three weeks

of the beginning of employment. These promises were made in some of the Plaintiffs contracts, in e-mails from administrative staff and via phone.

33.    On July 9, 2007, members of the "legal team" assembled for a meeting in Washington DC for purposes of receiving further instruction on the project. Employees that could not attend the meeting in person were connected via telephone conference.

34.    "Gerald Edward" participated in the meeting via telephone conference, providing a history of the company and answering questions from the new hires.

35.    "Gerald Edward" also further explained the project, which was the creation of a financial information website that would provide information on foreign investment to individuals worldwide. "Gerald Edward" promised that the project was being funded by venture capitalists in an amount of at least $15 million, that the project was to be kept confidential and that the company was incorporated in Washington, DC under the name Alulim Willow Property Group, LLC. Edwards made a handout available with this information.

36.    When pressed for details of promised compensation, "Gerald" provided assurances that funds were available and that payments would be made as promised in the Plaintiffs' individual employment agreements.

37.    At approximately the same time as the July 9, 2007 meeting, Plaintiffs independently verified that the "Alulim Willow Property Group" corporate entity was lawfully registered with the District of Columbia.

38.    From July 9, 2007 to July 24, 2007 Plaintiffs performed the work assigned to them. The assigned tasks were consistent with the stated project mission of creating a financial information website. Members of the legal team researched international investment laws and provided advice on intellectual property matters. Other employees provided graphic design

6

services, researched foreign markets and performed other similar tasks.

39.    "Gerald" kept in touch with team leaders via e-mail and telephone, assigning tasks to employees and actively participating in the production process. Team leaders would subsequently assign tasks to each of their team members based on their communications with "Gerald".

40.    Plaintiffs produced substantial work product over the course of their employment. In addition to numerous memorandums and other written and graphical work product, Plaintiffs produced numerous e-mails, participated in many teleconferences and otherwise faithfully performed work contemplated under each of the individual employment agreements with TGS.

41.    Many employees worked 12-20 hour days in attempts to meet "Gerald's" deadlines.

42.    Throughout the project "Gerald" maintained active communication with team leaders, assigned tasks and accepted work product from the Plaintiffs.

43.    The Plaintiffs continued to work diligently for "Gerald" until July 24, 2007, the date on which "Gerald" promised that payments would be made to Plaintiffs.

44.    No Plaintiff was paid his or her promised compensation on July 24, 2007.

45.    Despite not making the agreed upon payments, all of the Plaintiffs received individual pay stubs via e-mail from administrative staff, who sent the pay stubs to each of the Plaintiffs under the direction of "Gerald."

46.    Despite not making the agreed upon payment, Defendants continued to provide assurances that funds were forthcoming. On July 24, 2007, "Gerald" sent an e-mail promising that "The payroll process is being completed."

47.    On July 24, 2007 "Gerald" sent a second e-mail stating "After my call with Deborah, Hasita will give you the specifics about what time people can expect their money."

7

48.    On July 25, 2007 "Gerald" sent an e-mail promising that "Final payroll was submitted last evening at 5:10 PM. As soon as I find out the exact time funds will hit your account I will make the announcement."

49.    On July 26, 2007, "Gerald" wrote an e-mail stating "The deposits were to be done by wire transfers. I am requesting the financial institution to perform over 70 wire transfers in a day for my account alone when they are accustomed to doing 20-30 per day branch wide. It is a logistical matter, not one based on the availability of funds."

50.    On July 27, 2007, "Gerald" wrote an e-mail stating "If I do not receive the payroll wire confirmations today I will have certified funds sent via FED EX or UPS overnight and in the hands of each employee before the end of business Monday."

51.    On July 28, 2007, "Gerald" wrote another e-mail stating "I accept blame and responsibility for late payroll."

52.    After July 28, "Gerald" ceased correspondence with employees altogether.

53.    Despite "Gerald's" disappearance, Plaintiffs remained willing and able to complete the terms of each of their respective employment agreements as soon as compensation is furnished under the terms of the individual employment agreements.

54.    On the date of this filing no Plaintiff has been paid the monies promised under the individual employment agreements.

55.    Each of the Defendants personally directed, participated in and ratified the actions alleged herein.

56.    Defendants and their agents planned, executed, contracted for, directed, managed and ratified the conduct alleged herein, created the fraudulent scheme, and/or played a substantial role in its creation.

57.    Defendants acted as agents for each other, and participated in, collaborated in, facilitated and ratified all procedures related to the scheme.

58.    All persons and entities who participated in any aspect of the transmissions were acting as agents of Defendants.

59.    Plaintiffs seek the greater of actual damages or statutory damages, as the evidence at trial may demonstrate.

### D. Causes of Action

*Count I: Breach of Contract*

60.    Plaintiffs incorporate each and every one of the allegations of this Complaint, without exception, to each of the causes of action alleged herein.

61.    Defendants are liable to Plaintiffs under a common law breach of contract theory.

62.    Plaintiffs and Defendants entered into numerous written agreements, the terms of which were substantially the same for all Plaintiffs.

63.    Each written agreement, drafted by Defendants, provided that the individual Plaintiffs would work on various legal, technical, editing, writing and related tasks in an effort to assist in the construction of a financial information web site.

64.    The consideration for each Plaintiff's efforts set forth in the agreements was fair and reasonable given the tasks assigned to the Plaintiffs.

65.    Plaintiffs performed all conditions, covenants, and promises required by them in accordance with the terms and conditions of the contract.

66.    On or about July 24, 2007 the Defendants breached the Plaintiffs' employment agreements by failing to pay the agreed upon consideration to any of the named Plaintiffs.

67.    Defendant made numerous statements assuring Plaintiffs that payment was

9

forthcoming, but payment has not been supplied as provided in the applicable agreements.

68.     By reason of Defendants' breach of each of the Plaintiffs' contracts Plaintiffs have suffered damages in an amount to be proven at trial.

*Count II: Fraud and Fraudulent Misrepresentation*

69.     The elements of a civil action for fraud are (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation. Hoffman v. Stamper, No. 560, September Term, 2002 (Md. App. 2/27/2004) (Md. App., 2004) (citations omitted).

70.     The Defendants made a false representation to the Plaintiff by stating that the employment agreements were backed by venture capital of at least $15 million.

71.     The falsity of such statements were either known to the Defendant or the representations were made with reckless indifference as to its truth.

72.     The Defendants' misrepresentation were made for the purpose of defrauding the Plaintiffs and obtaining the value of the Plaintiffs' work with no ability or intention to pay under the terms of the Agreement.

73.     Plaintiffs relied on the Defendants' misrepresentations. Plaintiffs had the right to rely on the representations based on the Defendants' demonstration of legitimacy, such as official corporate filings and tax identification numbers, among other things.

74.     Plaintiffs suffered compensable injury resulting from the Defendants'

misrepresentations in an amount to be proven at trial.

*Count III: Unjust Enrichment*

75.    Plaintiff may recover under a theory of unjust enrichment when there is (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value. Hill v. Cross Country Settlements, LLC, 914 A.2d 231, 172 Md. App. 350 (Md. App., 2007).

76.    Plaintiffs routinely provided work product to Defendant.

77.    Defendants received the benefit of the work-product of the Plaintiffs, and Defendants were consistently aware of the benefits they were receiving.

78.    The Defendant accepted and retained the Plaintiffs' work-product without providing the agreed upon consideration contained in Plaintiffs' employment agreements.

79.    Defendants were unjustly enriched and Plaintiffs are entitled to the value of their work as provided in each of the Plaintiffs' respective employment agreements.

*Count IV: Civil Racketeer Influenced and Corrupt Organizations (RICO)*

80.    RICO provides that "It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation

of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. §1962 et seq.  A "racketeering activity" is defined by 18 U.S.C. §1961.

81.     Defendants are liable for numerous racketeering activities, including, but not limited to, "(B) any act which is indictable under any of the following provisions of title 18, United States Code: . . . section 1028 (relating to fraud and related activity in connection with identification documents) . . . section 1343 (relating to wire fraud) . . . section 1544 (relating to misuse of passport) . . . section 1952 (relating to racketeering)."

82.     18 U.S.C. §1028(a) provides for liability for a person or entity who "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law."

83.     18 U.S.C. §1343 provides for liability for any person or entity "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme."

84.     18 U.S.C. § 1544 provides for liability for any person or entity that "willfully and knowingly uses, or attempts to use, any passport issued or designed for the use of another; or whoever willfully and knowingly uses or attempts to use any passport in violation of the conditions or restrictions therein contained, or of the rules prescribed pursuant to the laws regulating the issuance of passports; or whoever willfully and knowingly furnishes, disposes of,

or delivers a passport to any person, for use by another than the person for whose use it was originally issued and designed."

85.     18 U.S.C. 1952 provides "whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to— (1) distribute the proceeds of any unlawful activity; or (2) commit any crime of violence to further any unlawful activity; or (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform— (A) an act described in paragraph (1) or (3) shall be fined under this title, imprisoned not more than 5 years, or both; or (B) an act described in paragraph (2) shall be fined under this title, imprisoned for not more than 20 years, or both, and if death results shall be imprisoned for any term of years or for life."

86.     RICO provides that "(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c).

87.     Injunctive relief is also available under 18 U.S.C. §1964(a).

88.     Defendants' scheme of creating fraudulent corporate entities, maintaining fraudulent identities and participating within the enterprise constitutes racketeering activities under 18 U.S.C. §1961.

89.     Plaintiffs suffered compensable injury resulting from the Defendants' racketeering activity in an amount to be proven at trial.

13

*Count V: Unlawful Access to Stored Communications*

90.     Under federal law a Defendant is liable for statutory damages when that person or persons "(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; . . . (2) intentionally exceeds an authorization to access that facility; and thereby obtains . . . [an] electronic communication while it is in electronic storage in such system." 18 U.S.C. §2701(a)(1)-(2).

91.     Plaintiffs electronically provided sensitive personal and financial information to Defendants based on Defendants' fraudulent representations that the provided information would be used for purposes of complying with federal and local tax and employment laws.

92.     In fact, Defendants collected the information for purposes unrelated to processing payments. On information and belief, Plaintiffs allege that the sensitive personal information was sold on the black market to criminal interests.

93.     Most information was transferred to Defendants via e-mail. Defendants stored the private information on electronic server computers before transferring it to third-party interests, as discovery will prove.

94.     Such use of information exceeded Plaintiffs' authorizations, in violation of 18 U.S.C. § 2701, leading to statutory and compensatory damages to be proven at trial.


*Count VI: The Maryland Consumer Protection Act*

95.     To curtail unfair or deceptive trade practices targeted at its consumers, the General Assembly enacted Md. Code Ann., Com. Law. §13-101, et seq., known as the Maryland Consumer Protection Act ("MCPA").

96.     MCPA was enacted to provide strong protective and preventive steps to investigate

14

unlawful consumer practices, to assist the public in obtaining relief from these practices, and to prevent these practices from occurring in Maryland. Id., §13-102(b)(3).

97.    MCPA §13-301(1) defines unfair or deceptive trade practices to include any false, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers.

98.    MCPA §13-303 provides that a person may not engage in any unfair or deceptive trade practice in: (1) the sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services; or (2) the offer for sale, lease, rental, loan, or bailment of consumer goods, consumer realty, or consumer services.

99.    MCPA §13-302 provides that prohibited practices are violations of MCPA, regardless of whether any consumer in fact has been misled, deceived, or damaged as a result of that practice. MCPA §13-408 authorizes any action allowed by law, including injunctive relief, and provides for reasonable attorney's fees.

100.    Defendants violated the MCPA by making false and deceptive statements about their true identities, the availability of funds available to compensate Plaintiffs and numerous other matters.

101.    Plaintiffs suffered injury resulting from the Defendants' activity, and public interest requires that Defendants be enjoined from future fraudulent activity.

* * *

Wherefore, Plaintiffs seek judgment against Defendants and each of them, jointly and severally, for damages in excess of $500,000 plus interest, costs, injunctive relief, attorney's fees and such other and further relief as the Court deems appropriate.

15

_____    08/24/2007____
Eric J. Menhart                                      Date

CyberLaw P.C.
401 E. Jefferson Ave, Suite 201
Rockville, MD 20850
Bar ID #16869
Telephone: 240-606-7092
Fax: 240-539-6235
eric.menhart@cyberlawonline.com

_____/s/_____    08/24/2007____
Christopher Aldo Porco*                          Date

The Law Offices of Christopher Aldo Porco, PLLC
910 17th Streent NW, Suite 800
Washington, DC 20006
Telephone: 202-331-4444
Fax: 202-331-4451
porco@porcolaw.com

* Pending Admission *Pro Hac Vice*

### Jury Demand

Plaintiffs respectfully request a trial by jury as to all issues so triable.

_____
                Eric J. Menhart

16